1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

KEVIN JUNIOR MORGAN,

               Petitioner,

    v.

CRAIG KOENIG, Warden,

               Respondent.

Case No. 2:18-cv-05918-MAA

**MEMORANDUM DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.   INTRODUCTION

On July 18, 2019, the Court received and filed Petitioner Kevin Junior Morgan's ("Petitioner") operative First Amended Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("FAP"). (FAP, ECF No. 38.)  The FAP challenges a 2017 criminal judgment Petitioner sustained in the Los Angeles County Superior Court. (*Id.* at 2.)[1]  Petitioner, who is

---

[1] Pinpoint citations of briefs, exhibits, and Lodged Documents ("LD") in this Order refer to the page numbers appearing in the ECF-generated headers.  Pinpoint citations of the Clerk's Transcript ("CT") (CT, ECF Nos. 31-1 to 31-2) and Reporter's Transcript ("RT") (RT, ECF Nos. 31-3 to 31-5) refer to the transcripts' own volume- and page-numbering schemes.

proceeding *pro se*, asserts the following three grounds for relief: (1) the prosecution introduced false evidence at trial; (2) Petitioner's pre-trial and trial attorneys provided ineffective assistance of counsel; and (3) the introduction of false testimony and evidence at trial violated Petitioner's right to due process. (*See id.* at 5–6, 45–89.) On September 12, 2019, Respondent Craig Koenig ("Respondent") filed an Answer. (Answer, ECF No. 41.) The Court received and filed Petitioner's Traverse on January 17, 2020. (Traverse, ECF No. 50.)

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge. For the reasons stated below, the Court denies the Petition and dismisses this action with prejudice.

## II.   PROCEDURAL SUMMARY

In Los Angeles County Superior Court, a jury convicted Petitioner of two counts of assault with a firearm (Counts One and Two) (Cal. Penal Code § 245(a)(2)), and two counts of making criminal threats (Counts Four and Five) (Cal. Penal Code § 422).[2] (LD 1, ECF No. 11-1, at 2; 2 CT 238–42; 3 RT 910–12.) The jury also found true special allegations that Petitioner committed each of these offenses for the benefit of, at the direction of, or in association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)). (LD 1 at 2; 2 CT 238–42; 3 RT 910–12.) After waiving his right to a jury trial on prior conviction allegations, (3 RT 698–700), Petitioner admitted to a prior burglary conviction (*id.* at 1206), which led to a sentencing enhancement under California Penal Code section 667(b) ("Section 667(b)").

_____

[2] The jury acquitted Petitioner of one count of assault with a firearm (Count Three) and two counts of false imprisonment (Counts Seven and Eight) (Cal. Penal Code § 236). (2 CT 240, 243–44; 3 RT 911–13.) The jury also found not to be true special allegations that Petitioner personally used a deadly and dangerous weapon (to wit: a knife) in committing the offenses of conviction (Cal. Penal Code § 12022(b)(1)). (2 CT 238–42; 3 RT 910–12.)

The trial court sentenced Petitioner to state prison for a total determinate term of eleven years:  four years for the Count One assault, and five years for the Count One criminal street gang enhancement, totaling nine years for Count One; a consecutive one-year sentence for the Count Two assault; and a consecutive one-year sentence for the Section 667(b) enhancement.[3]  (LD 1 at 2; 3 RT 1218–19.)

Petitioner appealed his judgment of conviction to the California Court of Appeal.  (2 CT 296; LD 11, ECF No. 31-6.)  On April 2, 2018, the Court of Appeal issued a reasoned decision denying Petitioner's appeal and affirming his convictions and sentence.  (LD 2, ECF No. 11-2.)  On May 2, 2018, Petitioner filed a counseled petition for review with the California Supreme Court, (LD 3, ECF No. 11-3), which was summarily denied on July 11, 2018, (LD 4, ECF No. 11-4).

On June 12, 2017, while his criminal appeal was pending, Petitioner filed a *pro se* petition for writ of habeas corpus in the Los Angeles County Superior Court. (LD 5, ECF No. 11-5.)  The Superior Court denied the *pro se* petition for lack of jurisdiction on October 18, 2017.  (LD 6, ECF No. 11-6.)  On December 15, 2017, Petitioner, filed a *pro se* petition for writ of mandate or prohibition in the California Court of Appeal, challenging the Superior Court's habeas ruling.  (LD 7, ECF No. 11-7.)  On December 21, 2017, the Court of Appeal denied the petition, stating that "[p]etitioner is represented by counsel on appeal and may not file a pro se petition on matters that fall within counsel's scope of representation."  (LD 8, ECF No. 11-8.)  On March 23, 2018, Petitioner filed a *pro se* petition for writ of habeas corpus in the California Supreme Court.  (LD 9, ECF No. 11-9.)  On June 13, 2018, that court denied the petition without comment or citation of authority.  (LD 10, ECF No. 11-10.)

On July 6, 2018, this Court received and filed Petitioner's initial Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254

---

[3] The trial court stayed sentencing on Counts Four and Five, as well as on the Count Two criminal street gang enhancement.  (LD 1 at 2; 3 RT 1218–19.)

1   ("Petition").  (Pet., ECF No. 1.)  On December 18, 2018, Respondent moved to

2   dismiss Ground Four of the Petition as unexhausted.  (Mot. to Dismiss, ECF No.

3   19.)  Petitioner then filed the FAP, withdrawing Ground Four, which the Court

4   received and filed on July 18, 2019.  Respondent filed the Answer to the FAP on

5   September 12, 2019.  The Court received and filed Petitioner's Traverse on January

6   17, 2020.  The case is now ready for decision.

7

8   **III.**   **FACTUAL SUMMARY**

9       Pursuant to 28 U.S.C. § 2254(e)(1), a factual summary from a state appellate

10   court's opinion is entitled to a presumption of correctness that may be rebutted only

11   by clear and convincing evidence that the facts were otherwise.  *See Hedlund v.*

12   *Ryan*, 854 F.3d 557, 563 (9th Cir. 2017).  Petitioner does not challenge the

13   following summary of the evidence presented at trial as described in the California

14   Court of Appeal's decision of Petitioner's direct appeal:

15       On June 5, 2016, Stanley M., Reykeisha T., and her daughter

16       were visiting Reykeisha's sister, Renisha, who lived with her

17       boyfriend, Eric.  Stanley and Reykeisha went to a store around 10:00

18       p.m.  Stanley noticed a white Cadillac Seville blocking the driveway

19       when they returned.  As he got out of the car Stanley saw defendants

20       [Petitioner and co-defendant Anthony Philyaw] approaching him in an

21       aggressive manner.

22       Philyaw asked, "Who are you?" and said, "We don't know

23       you."  Defendants said that they were looking to kill someone because

24       a friend or family member who was a Hoover gang member was

25       killed in the area.  They said they were Hoover gang members.

26       Stanley said he was "nobody" to signify that he was not affiliated with

27       a gang.  Philyaw pulled out a gun and threatened to shoot Stanley.

28

1    Morgan took out a pocket knife, waved it aggressively, and told
2    Stanley not to move.
3         Reykeisha got out of the car and walked to the driver's side.
4    She saw defendants approaching from the white Cadillac.  Both
5    defendants looked angry, and Philyaw appeared drunk.  Philyaw
6    reached inside his jacket pocket, pulled out a gun, and pointed it at
7    Reykeisha's chest.  Philyaw said that he came to retaliate for the death
8    of his "homeboy."  Defendants threatened to kidnap Reykeisha, throw
9    her in the trunk, and kill her.  Philyaw repeatedly took the gun out of
10   his pocket and pointed it at Reykeisha.  Both defendants threatened to
11   kill Stanley.  Stanley saw Philyaw grope Reykeisha.  Reykeisha tried
12   to get away, but Philyaw grabbed her arm.
13        Renisha came out of the house, saw the gun, and slammed the
14   door.  She came out again a little later to check on Reykeisha and
15   Stanley and ask what the commotion was about.  Reykeisha said she
16   was okay, but gave her sister a look to indicate that she was not.
17   Philyaw told Renisha about the murder of his friend or family
18   member.  He crouched down and placed the gun on the sidewalk.
19   Renisha walked back into the house.
20        Reykeisha asked Philyaw to let Stanley leave.  Defendants let
21   Stanley go, and he drove away.  Morgan then walked to the white car
22   and got a 40-ounce bottle of beer.  Both defendants were drinking.
23   Morgan began pacing back and forth to the car.  He said that they
24   should leave before someone called the police.
25        At some point, Eric came outside and stood on the porch.  He
26   yelled at defendants and asked what they were doing there.  Philyaw
27   pointed a gun at Eric and threatened to kill him.  Eric went back
28   inside.

Reykeisha pleaded with defendants to let her get her daughter and leave.  They let her go into the house.  Reykeisha asked her sister to call the police before walking back outside with her daughter.  Philyaw prevented Reykeisha from getting into her car.  While blocking the car door, Philyaw groped Reykeisha's breasts and buttocks over her clothes, and licked her neck.  Reykeisha thought Philyaw said "107 Hoovers," and was a Hoover gang member.

After about an hour, the police arrived and told everyone to put their hands up.  Philyaw did not comply.  He walked behind Reykeisha's car and tossed the gun into the side yard.

Los Angeles Police Department Officers David Tello and Ali Kaspian responded to Renisha's house.  When they arrived, Officer Tello saw Reykeisha's SUV and a white Cadillac behind it.  Reykeisha was standing between the driver's door and the door frame of the SUV.  Philyaw was standing in front of Reykeisha.  Morgan was about five feet behind them.

Officer Tello directed defendants to the middle of the street.  Morgan complied, but Philyaw backed away toward the rear of the SUV.  Philyaw appeared to toss something.  Morgan started yelling and being uncooperative.  He had a 40-ouce beer bottle and threw it under a car.  He walked in a circle and appeared upset and angry.  Officer Kaspian recovered a loaded nine millimeter handgun from where Philyaw had tossed it.  No knife was recovered.

(LD 2 at 5–6.)

## IV.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d) ("Section 2254(d)"), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

6

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Section 2254(d) applies even where there has been a summary denial." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). When a state court has denied a habeas petition summarily, the Court "must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that these arguments or theories are inconsistent with the holding in a prior decision" of the United States Supreme Court. *Id.* (alterations in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). However, "when it is clear that a state court has not reached the merits of a properly raised issue, [the Court] must review it de novo." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *cf.* 28 U.S.C. § 2254(d) (AEDPA deference applies to "any claim that was adjudicated *on the merits* in State court proceedings" (emphasis added)).

In this case, it is unclear whether the Section 2254(d) or de novo standard of review applies to Petitioner's claims. Petitioner exhausted his current claims in Grounds One through Three during his state post-conviction proceedings. (*See* LDs 5, 7, 9.) The Los Angeles County Superior Court denied Petitioner's habeas corpus petition for lack of jurisdiction because his criminal appeal was pending. (LD 6 at 3.) The California Court of Appeal denied Petitioner's petition for a writ of mandate based on the following reasoning: "Petitioner is represented by counsel on

appeal and may not file a pro se petition on matters that fall within counsel's scope of representation."  (LD 8 (citing *In re Barnett*, 31 Cal. 4th 466, 477 (2003)).)  Petitioner filed his *pro se* habeas corpus petition in the California Supreme Court on March 23, 2018.  (LD 9.)   The California Court of Appeal affirmed Petitioner's judgment of conviction on April 2, 2018.  (LD 2.)  Petitioner filed his counseled petition for review in the California Supreme Court on May 2, 2018.  (LD 3.)  The California Supreme Court summarily denied Petitioner's habeas corpus petition on June 13, 2018.  (LD 10.)  The California Supreme Court summarily denied Petitioner's petition for review in his criminal appeal on July 11, 2018.  (LD 4.)

Generally, where a state supreme court decision is unexplained, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them *no* effect-which simply 'looks through' them to the last reasoned decision-most nearly reflects the role they are ordinarily intended to play.").  In cases where "the last reasoned opinion on the claim explicitly imposes a procedural default, [the federal court] will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Ylst*, 501 U.S. at 803.  However, this presumption can be rebutted by "strong evidence" that the highest state court did not rely on a procedural bar and instead reached the merits of the claims.  *Id.* at 804; *see also Kernan v. Hinojosa*, 136 S. Ct. 1603, 1606 (2016) (per curiam) (holding that "[i]mproper venue could not possibly have been a ground" for a state high court's summary denial of petitioner's claim and that the "'look through' approach' is therefore inapplicable.").

Respondent argues that the "look-through" presumption has been rebutted here because Petitioner did not have a pending criminal appeal and was not

counseled when the California Supreme Court summarily denied his habeas corpus petition. (Answer 7–8 & n. 6.) However, the procedural history is more complicated: Petitioner was represented by counsel in his criminal appeal before the California Court of Appeal when he filed his March 23, 2018 *pro se* habeas corpus petition with the Supreme Court, and he had a counseled petition for review pending with the California Supreme Court at the time that court issued its summary denial of his habeas corpus petition on June 13, 2018. (*See* LDs 2–4, 9.) Petitioner argues in his Traverse that the California Supreme Court agreed with and adopted the Court of Appeal's procedural reasoning in summarily dismissing his habeas petition. (Traverse 6–7.)

Given this procedural history and the summary nature of the California Supreme Court's decision, it is not entirely clear that the California Supreme Court ruled on the merits of Petitioner's claims rather than relying upon the procedural bar articulated by the California Court of Appeal: namely, that Petitioner could not pursue his habeas claims *pro se* while he was represented by counsel in the pending criminal appeal.[4]

Thus, in an abundance of caution, the Court considers Petitioner's claims de novo. *See Berghuis v. Thompkins*, 560 U.S. at 390 ("[W]e need not determine whether AEDPA's deferential standard of review applies in this situation . . . because, even if AEDPA deference does not apply, [the petitioner] cannot show prejudice under de novo review, the more favorable standard of review for [the petitioner]." (citations omitted)).

---

[4] Respondent does not argue that Petitioner's current habeas claims are procedurally defaulted. (*See generally* Answer.) Because procedural default is an affirmative defense and Respondent has not raised it, this Court does not consider whether the procedural bar articulated by the Court of Appeal provided an adequate and independent ground for denying relief. *See Scott v. Schriro*, 567 F.3d 573, 580 (9th Cir. 2009) ("Procedural default is an affirmative defense, and *the state has the burden* of showing that the default constitutes an adequate and independent ground for denying relief." (citation and quotation marks omitted) (emphasis in original)).

9

**V.    DISCUSSION**

Petitioner asserts three grounds for relief:

1.    The District Attorney introduced false physical evidence at trial.

2.    Petitioner's trial counsel rendered constitutionally ineffective assistance.

3.    Petitioner's Fourteenth Amendment Due Process Clause rights were violated by the introduction of false trial testimony and evidence.

(FAP 5–6, 45–89.)

The Court considers each of these grounds and concludes that Petitioner is not entitled to federal habeas relief.[5]  Consequently, the FAP is denied.

**A. Habeas relief is not warranted for Petitioner's false evidence and due process claims in Ground One.**

In Ground One, Petitioner claims that "the District Attorney knowingly introduced false physical evidence at trial."  (FAP 5.)  First, Petitioner asserts that Officers Kaspian and Tello falsified a confidentiality opt-out document informing Eric C. ("Eric")—one of the alleged victims and witnesses—that his full name would become part of the public record unless he requested it to remain confidential.  (*Id.* at 5, 45–53.)  Second, he alleges that Officers Kaspian and Tello

---

[5] In his Traverse, Petitioner also argues that his Sixth Amendment Confrontation Clause rights were violated because there was trial testimony regarding an alleged victim who did not testify.  (Traverse 9.)  Petitioner has waived this claim by raising it for the first time in his Traverse.  *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed waived.")  Moreover, this claim would fail because Petitioner has not identified any out-of-court, testimonial statements that were admitted at trial, as required to show a Confrontation Clause violation.  *See Crawford v. Washington*, 541 U.S. 36, 53–54 (2004) (holding that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.").

falsely stated in a June 6, 2016 police report that they interviewed Eric on the night of the incident, and that Eric told them that one of the suspects had pointed a gun at him. (*Id.* at 46, 49–50.)  Third, Petitioner asserts that photographs of Eric and his girlfriend, Renisha T. ("Renisha") which were introduced at trial were "false evidence" because the admission of such photographs did not serve any proper evidentiary purpose. (*Id.* at 34.)

Respondent contends that Petitioner has not alleged a due process claim or any other constitutional claim based upon presentation of false evidence because the allegedly false confidentiality opt-out document and police report were never presented to the jury. (Answer 31.)  Respondent argues that the photographs of Eric and Renisha were properly admitted; or alternatively, that the admission of these photographs did not prejudice Petitioner. (*Id.* at 21.)

In his Traverse, Petitioner reiterates that the confidentiality opt-out record and police report are false, but he does not assert that these documents were introduced at trial. (*See* Traverse 10–11.)

1. <u>Background</u>

In Count Three, the prosecution charged Petitioner and his co-defendant, Mr. Philyaw, with assaulting Eric with a firearm. (1 CT 166; 2 RT 5.)  However, Petitioner was acquitted on this count. (2 CT 240; 3 RT 911.)  Petitioner was convicted of assaulting Reykeisha T. ("Reykeisha") and Stanley M. ("Stanley") with a firearm (Counts One and Two) and of making criminal threats against Reykeisha and Stanley (Counts Four and Five). (2 CT 238–42; 3 RT 910–12.)

Eric did not testify at Petitioner's trial.  Reykeisha testified that she and her friend Stanley were confronted by Petitioner and Mr. Philyaw in the driveway of a house where her sister (Renisha) and her sister's boyfriend (Eric) lived. (2 RT 309–18.)  On direct examination, Reykeisha identified photographs of Renisha, Stanley, and Eric. (2 RT 313–14; *see also* 1 RT 5.)  Petitioner's attorney did not object to

11

the introduction of these photographs.  (*See* 2 RT 313–14.)  Reykeisha testified that

at one point during her hours-long encounter with Petitioner and Mr. Philyaw in

Eric and Renisha's driveway, Eric came out onto the front porch of the house and

yelled at Petitioner and Mr. Philyaw.  (2 RT 334–35.)  According to Reykeisha, Mr.

Philyaw pointed his gun at Eric and threatened to kill him; Eric then cursed and

went back inside the house.  (*Id.* at 335–37.)  On cross examination, Reykeisha

maintained that Eric came outside and yelled at Petitioner and Mr. Philyaw, and

that Mr. Philyaw then pointed his gun at Eric.  (*Id.* at 362, 365, 377, 379.)  She

added that her friend Stanley was present when this occurred.  (*Id.* at 362, 365,

377.)  However, Stanley testified that he did not see Eric or any other men come

outside during the incident.  (*Id.* at 422, 435, 445.)

Officer Tello testified on direct examination that he arrived at the scene,

detained Petitioner and Mr. Philyaw, and then spoke with Reykeisha outside.  (2 RT

450–59.)  He did not testify about any interactions with Eric, or any other victims

or witnesses.  (*See id.*)  On cross examination, Officer Tello stated that neither he

nor his partner (Officer Kaspian) spoke with the 911 caller on the night of the

incident.  (2 RT 462.)  Officer Kaspian testified only that he arrived at the scene

and recovered a firearm that he had seen Mr. Philyaw discard.  (2 RT 467–70.)  No

police reports or other documents regarding Eric's statements to the police were

admitted at trial.  (*See* 1 RT 5–7 (Index of Trial Exs.).)

### 2. Legal Standard

#### a. *Due Process challenge based on false evidence*

A prosecutor's knowing use of false evidence or testimony to obtain a

conviction may violate due process.  *See Napue v. Illinois*, 360 U.S. 264, 269

(1959); *accord Giglio v. United States*, 405 U.S. 150, 153 (1972) ("[D]eliberate

deception of a court and jurors by the presentation of known false evidence is

incompatible with 'rudimentary demands of justice.'"  (citation omitted)).  "In

12

1    addition, the state violates a criminal defendant's right to due process of law when,
2    although not soliciting false evidence, it allows false evidence to go uncorrected
3    when it appears." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc).
4    To prevail on a due process claim based on the presentation of false evidence, a
5    petitioner must show that "(1) the testimony (or evidence) was actually false,
6    (2) the prosecution knew or should have known that the testimony was actually
7    false, and (3) the false testimony was material." *Reis-Campos v. Biter*, 832 F.3d
8    968, 976 (9th Cir. 2016) (citation and quotation marks omitted).  False testimony or
9    evidence is material if "there is any reasonable likelihood that the false testimony
10   could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S.
11   667, 678 (1985) (citation and quotation marks omitted).
12
13                    *b.  Due Process challenge based on improper admission of evidence*
14           A state court's evidentiary errors are not cognizable on federal habeas review
15   without a showing that the errors violated federal law.  *See Estelle v. McGuire*, 502
16   U.S. 62, 67–68 (1991); *Rhoades v. Henry*, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011)
17   ("[E]videntiary rulings based on state law cannot form an independent basis for
18   habeas relief.").  "The admission of evidence does not provide a basis for habeas
19   relief unless it rendered the trial fundamentally unfair in violation of due process."
20   *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting *Johnson v.*
21   *Sublett*, 63 F.3d 926, 930 (9th Cir. 1995)).  "A habeas petitioner bears a heavy
22   burden in showing a due process violation based on an evidentiary decision."
23   *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).
24           Further, to merit habeas relief, a petitioner must show the constitutional
25   error's "substantial and injurious effect or influence in determining the jury's
26   verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation and quotation
27   marks omitted); *see also Plascencia v. Alameida*, 467 F.3d 1190, 1203 (9th Cir.
28   2006) (applying *Brecht* analysis to claim of erroneous admission of evidence).

"[R]elief is proper only if the federal court has grave doubt about whether a trial error of federal law" had such a prejudicial effect. *Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015) (citation and quotation marks omitted).

### 3. Analysis

#### a. *Allegedly False Records*

Petitioner alleges that on June 6, 2016, Los Angeles Police Department Officers Kaspian and Tello, and Lieutenant Duke, "maliciously conspired by introducing to the court false documents and statements surrounding Eric C. (Victim 3)." (FAP 45.)  The first document that Petitioner alleges to be false is a confidentiality opt-out record, dated June 6, 2016, which states that Eric elected to remain confidential rather than having his full name become part of the public record. (*Id.* at 48.)  Petitioner argues that this document must be false because Officers Kaspian and Tello did not have any contact with Eric on June 5—the night of the incident—and Eric later refused to speak to the police. (*Id.* at 45–46; Traverse 10–11.)

Relatedly, Petitioner argues that a June 6, 2016 police report was false. (FAP 46–50; Traverse 11.)  Petitioner attaches the first page of this report, which identifies Eric as a victim and states: "Vict[im] heard arguing outside and stepped out to investigate. Suspect pointed handgun at vict[im]." (FAP 52; Traverse 23.) Petitioner argues that other police reports contradicted this document and showed that the officers did not interview Eric. (*Id.* at 45–46, 49–50.)  Petitioner points to an arrest report stating that the officers canvassed the area for additional witnesses without success. (*Id.* at 45, 46, 49.)  He attaches an excerpt from this report to his Traverse.[6] (*Id.* at 82.)  Petitioner also alleges that another police report stated that

---

[6] The arrest report also states that individuals identified as "V-3" and "Wit." exited the residence and spoke with the police officers. (Traverse 82.)  Although it is not entirely clear, "V-3" and "Wit." appear to refer to Eric and Renisha. (*Id.*)  For

1    Eric refused to speak to lead investigator Detective Lorenz on June 7, 2016.  (FAP

2    49–50; Traverse 10.)  However, Petitioner has not attached this report to his FAP or

3    Traverse.  (*See* FAP; Traverse.)

4         Petitioner's *Napue* claim in Ground One fails because he has not shown that

5    any asserted falsehoods were material, or in other words, "reasonably likely to have

6    affected the judgment of the jury."  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th

7    Cir. 2001).  The confidentiality opt-out record and police report were not

8    introduced at trial.  (*See* 1 RT 5–7.)  Neither Officer Tello nor Officer Kaspian

9    testified to any interviews with Eric.  (*See* 2 RT 450–59, 467–70.)  The only trial

10   testimony regarding Eric's interactions with Petitioner and Mr. Philyaw came from

11   Reykeisha.  (*See id.* at 334–37.)  Petitioner's allegations that Eric never spoke to the

12   police do not contradict or undermine Reykeisha's testimony that Mr. Philyaw

13   pointed a gun at Eric.  (*See id.*)  Thus, there has been no showing that Reykeisha's

14   testimony was false, let alone that the prosecution knew or should have known that

15   it was false.  *See Hayes v. Ayers*, 632 F.3d 500, 520–21 (9th Cir. 2011) (affirming

16   district court's denial of *Napue* claim where petitioner failed to show that a

17   witness's testimony was actually false or that the prosecution knew it was false).

18   Further, Petitioner was acquitted of assaulting Eric, as charged in Count Three.  (2

19   CT 240; 3 RT 911.)  Thus, Petitioner has not shown "any reasonable likelihood that

20   the false [documents] could have affected the judgment of the jury."  *Bagley*, 473

21   U.S. at 678.

22   ///

23   ///

24   ///

25

26   ─────────────

27   example, "Wit." stated that "V-1 [is] her sister" and identified V-3 as her boyfriend.
     (*Id.*)  Thus, the arrest report's statement that the officers canvassed the area and did

28   not find additional witnesses does not necessarily mean that the officers did not
     interview Eric and Renisha that night, as Petitioner asserts.

1

*b.  Admission of Photographs*

2          Petitioner asserts that the photographs of Renisha and Eric that were

3  introduced at trial are "false evidence" because the admission of those photographs

4  did not serve any proper evidentiary purpose.  (FAP 38.)  Petitioner does not allege

5  that these photographs were actually false in any way; rather, he argues that they

6  served no proper evidentiary purpose.  (*See id.*)  Thus, the Court applies the legal

7  standard for challenges to evidentiary errors rather than the *Napue* standard for

8  false evidence.

9          Challenges to the admission of evidence are generally state law claims that

10 do not warrant federal habeas relief.  *See Estelle*, 502 U.S. at 67–68.  "The issue for

11 [the federal courts], always, is whether the state proceedings satisfied due process;

12 the presence or absence of a state law violation is largely beside the point."  *Holley*,

13 568 F.3d at 1101 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir.

14 1991)).

15         In this case, the only reference to Eric and Renisha's photographs at trial

16 occurred at the beginning of Reykeisha's direct examination testimony.  (2 RT 313–

17 14.)  The prosecutor presented photographs of Eric, Renisha, and Stanley, along

18 with photographs of the defendants and the location where the incident occurred,

19 and Reykeisha identified the individuals and places in each photograph.  (*Id.* at

20 312–16.)  Although the purpose of these photographs was not explicitly stated, it

21 appears from the record that they were used as background evidence and to lay a

22 foundation for Reykeisha's testimony regarding Petitioner and Mr. Philyaw's

23 interactions with her, as well as with Eric and Renisha.  (*See id.*)  Petitioner asserts

24 that the photographs served no proper evidentiary purpose, but he does not explain

25 why the use of these photographs was improper and does not allege that the

26 photographs were inflammatory or otherwise prejudicial.  (*See* FAP 38.)  Thus,

27 Petitioner has not shown that the introduction of these photographs was so arbitrary

28 or prejudicial that it rendered his trial fundamentally unfair in violation of due

process.  *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995) (holding in a non-AEDPA case that the admission of prior acts evidence "was not arbitrary or so prejudicial that it denied [Petitioner] the fair trial guaranteed by due process.")

Further, even if Petitioner could show that admitting the photographs was a constitutional error, he has not demonstrated prejudice under *Brecht*, which requires him to establish that the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637; *see also Plascencia*, 467 F.3d at 1203.  Here, Petitioner has not provided any evidence or argument illustrating that admitting the photographs had any effect on the verdict.  Petitioner was acquitted of assaulting Eric, (2 CT 240; 3 RT 911), and was never charged with committing any crimes against Renisha, (*see* 1 CT 165–73).

Thus, Petitioner is not entitled to habeas relief on Ground One.

## B. Habeas relief is not warranted for Petitioner's ineffective assistance of counsel claims in Ground Two.

In Ground Two, Petitioner claims that his defense attorneys failed to provide constitutionally effective assistance of counsel, in violation of the Sixth Amendment.[7]  (FAP 5–6, 54–84.)  Petitioner raises twelve subclaims, arguing that one or both of his defense attorneys were ineffective for the following:  (a) failing to subpoena Eric and Renisha (*id.* at 55); (b) failing to subpoena Detective Lorenz (*id.*); (c) not requesting an evidentiary hearing after learning that the prosecution

---

[7] During pre-trial proceedings and at trial, Petitioner was represented by the Alternate Public Defender's Office.  (*See* 1 CT 1; 2 RT 1.)  Patricia Fullinwider represented Petitioner during pre-trial proceedings (*see* 1 CT 1), while Patrick Thomason represented Petitioner at trial (*see* 2 RT 1).  Petitioner does not state whether his claims are against Ms. Fullinwider, Mr. Thomason, or both attorneys.  (*See* FAP 5–6, 54–84.)  However, because Petitioner raises ineffective assistance claims that relate to both stages of the criminal proceedings, the Court construes the FAP as raising ineffective assistance claims against both Ms. Fullinwider and Mr. Thomason.

intended to present photographs of Eric and Renisha at trial (*id.*); (d) not presenting evidence regarding the 911 call to show that the call did not pertain to the incident between Reykeisha, Petitioner, and Mr. Philyaw (*id.* at 56); (e) failing to send an investigator to interview other witnesses who were at the house on the night of the incident (*id.*); (f) not presenting expert testimony that Stanley's behavior during the incident was inconsistent with someone who was being threatened (*id.* at 56–57); (g) failing to object to testimony regarding Eric and Renisha during the pre-trial proceedings and at trial (*id.* at 57); (h) failing to "allow for an opportunity to confront Sgt. Meisner[,] who[] approved the original arrest charges and the police reports done by Officers Tello and Kaspian" (*id.*); (i) not "allow[ing] for an opportunity to confront Detective Caffey #23900," who advised Sergeant Meisner, and Officers Tello and Kaspian, in an "unknown role" after Petitioner's arrest and may have suggested charging Petitioner with additional crimes (*id.* at 58); (j) failing to identify and subpoena additional officers who arrived at the scene after Officers Tello and Kaspian (*id.*); (k) failing to submit records regarding Petitioner's mental health to the trial court (*id.*); and (l) failing to object to the prosecutor's opening statement Petitioner had used a knife to threaten Stanley and Reykeisha (*id.* at 81).

Respondent first argues that Petitioner's ineffective assistance of counsel claim should be denied as conclusory because he has not provided detailed factual allegations or evidentiary support.  (Answer 22–25.)  Next, Respondent argues that each subclaim lacks merit because Petitioner does not:  (a) show that Eric or Renisha would have provided exculpatory testimony and or establish that the failure to call these witnesses resulted in prejudice (*id.* at 25); (b) show that Detective Lorenz's testimony regarding Eric and Renisha's statements would have been admissible or helpful to the defense (*id.* at 25); (c) establish that an evidentiary hearing regarding the photographs of Eric and Renisha was necessary or that he was prejudiced by his counsels' failure to request one (*id.* at 26); (d) show that the 911 caller would have provided helpful information for the defense, especially as the

prosecution did not introduce evidence regarding the 911 call (*id.* at 26–27);
(e) establish that counsels' failure to send an investigator to interview other
witnesses was ineffective assistance because he does not specify who else was
home during the incident or what they witnessed (*id.* at 27); (f) establish that expert
testimony regarding Stanley's behavior would have been available or beneficial (*id.*
at 27–28); (g) show that counsel's failure to suppress testimony regarding Eric and
Renisha resulted in prejudice (*id.* at 28); (h) provide any factual basis for calling
Sergeant Miesner as a witness or state what he would have testified to (*id.* at 28–
29); (i) provide any factual basis for calling Detective Caffey as a witness or state
what he would have testified to (*id.* at 29); (j) identify any other police officers who
responded to the scene or state what they would have testified to (*id.*); (k) show that
he was prejudiced by counsels' failure to submit his mental health records (*id.* at
29–30); (l) show any basis for objection to the prosecutor's opening statement
given Reykeisha and Stanley's testimony that Petitioner had a knife, or show
prejudice given that the jury found untrue the allegation that Petitioner used a knife
(*id.* at 30).

In his Traverse, Petitioner emphasizes a thirteenth subclaim which he argues
Respondent overlooked:  that his trial lawyer was ineffective for failing to object
when the jury misapplied the trial court's instructions on aiding and abetting.[8]
(Traverse 12–15.)

///

///

///

---

[8] In his FAP, Petitioner asserts that "the jury neglected to observe the elements and
instructions" on aiding and abetting, without further elaboration.  (FAP 81.)   He is
correct that Respondent did not address this assertion in the Answer.  (*See* Answer.)
However, in the Traverse, Petitioner argues for the first time that his trial lawyer
was ineffective for failing to object when the jury did not follow the aiding and
abetting instructions.  (Traverse 12–15.)

1    1. Background

2        *a. Preliminary Hearing*

3        At a preliminary hearing on July 28, 2016, the trial court heard testimony

4   from the following witnesses:  Reykeisha (1 CT 5–92); Stanley (*id.* at 93–124);

5   Officer Tello (*id.* at 125–41); and Officer Michael Barragan (*id.* at 141–57).[9]

6

7             i.   Reykeisha's Testimony

8        As now relevant, Reykeisha testified that her "sister's boyfriend" (Eric) came

9   outside and yelled at Petitioner and Mr. Philyaw to "get off his property," adding

10  that Stanley was not present for this.  (*Id.* at 26.)  In response, "the defendant with

11  the gun" (Mr. Philyaw) threatened to shoot Eric.  (*Id.* at 26–27.)  Eric "argued for a

12  little second and then he walked back in the house."  (*Id.* at 27.)  Reykeisha added

13  that her sister (Renisha) came out of the house with Eric, and Mr. Philyaw also

14  pointed his gun at her.  (*Id.* at 27–28.)  Later, Reykeisha went inside the house and

15  asked Eric and Renisha to call the police.  (*Id.* at 28.)

16       During her cross examination by Mr. Philyaw's attorney, Talia Mitchell,

17  Reykeisha testified that there were three adults at the house during her visit:

18  Renisha, Eric, and Eric's sister.[10]  (*Id.* at 47.)  She told her sister and her sister-in-

19  law (Eric's sister) to call the police.  (*Id.* at 49–50.)  When Ms. Mitchell asked

20  Reykeisha, "[h]ow soon after Stanley left did Eric come outside?", Reykeisha

21  responded, "[h]e came outside when Stanley was there."  (*Id.* at 50.)

22  ///

23  ///

24  ///

25  _____

26  [9] Officer Barragan testified in his capacity as a gang expert.  (*See* 1 CT 139–59.)
    Because none of Petitioner's claims relate to Officer Barragan's testimony, the
27  Court does not summarize it.

28  [10] Reykeisha also testified that her three-year-old daughter and three other children
    were at the house that night.  (1 CT 6, 73.)

1      Later, on cross examination by Petitioner's attorney, Ms. Fullinwider,

2  Reykeisha reiterated that Eric and Renisha came outside together while Stanley was

3  there and went back inside after they saw Mr. Philyaw point his gun at Eric.  (*Id.* at

4  71–72.)  She stated that Eric's sister never came outside.  (*Id.* at 72.)

5

6                    ii.  Stanley's Testimony

7      On his direct examination, Stanley testified that Reykeisha's sister (Renisha)

8  came outside twice.  The first time, Mr. Philyaw pulled his gun out, and Renisha

9  ran back into the house.  (1 CT 101, 104–05.)  About ten minutes later, while

10  Stanley and Reykeisha were still in the driveway with Mr. Philyaw and Petitioner,

11  Renisha came back outside.  (*Id.* at 105.)  She asked if everything was okay and

12  tried to de-escalate the situation.  (*Id.* at 105–06.)  However, when Renisha said that

13  Reykeisha needed to come inside and get her daughter, Mr. Philyaw refused to let

14  them leave.  (*Id.* at 106.)  Stanley testified that he was able to leave while Renisha

15  was still outside.  (*Id.* at 104.)  He said that he was afraid for his safety during the

16  encounter because Mr. Philyaw pulled out his gun, and both Mr. Philyaw and

17  Petitioner threatened to kill him multiple times.  (*Id.* at 106–07.)

18      During his cross examination by Ms. Mitchell, Stanley testified that Renisha

19  did not come into the yard the first time she came outside:  instead, she opened the

20  door, saw Petitioner and Mr. Philyaw, cursed, and shut the door.  (*Id.* at 113–14.)

21  He testified that Renisha waited a few minutes and then came out to the front gate.

22  (*Id.*)  Stanley stated that he was outside with Reykeisha, Petitioner, and Mr.

23  Philyaw for a total of fifteen or twenty minutes.  (*Id.* at 113, 117.)  On cross

24  examination by Ms. Fullinwider, Stanley testified that both Petitioner and Mr.

25  Philyaw threatened to kill him several times.  (*Id.* at 121–23.)

26  ///

27  ///

28  ///

21

iii. Officer Tello's Testimony

Officer Tello testified on direct examination that he spoke with Renisha after the incident.  (*Id.* at 131.)  He stated that Renisha told him she was babysitting for her sister (Reykeisha), and at some point Reykeisha came into the house and tried to tell Renisha something, but she could not understand what Reykeisha was saying.  (*Id.* at 132.)  He added that Renisha also told him that she and her boyfriend (Eric) went out into the yard later that night because they heard people outside, and someone (Mr. Philyaw) pointed his gun at them, identified himself as a 107 Hoovers gang member, and threatened to kill Eric.  (*Id.*)  On cross examination, Ms. Fullinwider questioned Officer Tello about the whether he or his partner recovered the knife Petitioner was alleged to have brandished, and Officer Tello stated that they did not.  (*Id.* at 135.)  Ms. Fullinwider asked Officer Tello to confirm the timeline of events that Renisha gave him:

> **Ms. Fullinwider:** And so just to be clear o[n] the timeline, when you spoke to Renisha, Renisha said that Reykeisha went into the house, got her child, went back outside and then it was almost two hours later that Renisha went outside with her boyfriend Eric and saw something going on outside and then saw the gun; is that right?
>
> **Officer Tello:** Yes.

(*Id.* at 136.)

b.  *Trial*

i.  Reykeisha's Testimony

Reykeisha testified at trial that she went to Eric and Renisha's house on the evening of June 5, 2016 with her three-year-old daughter.  (2 RT 309–10.)  Eric's adult sister, Eric's adult cousin, and two children were also at the house.  (*Id.* at 310.)  Stanley came to visit Reykeisha while she was there.  (*Id.*)  Reykeisha and Stanley went to the store, and upon their return, Petitioner and Mr. Philyaw

confronted them in Eric and Renisha's driveway and threatened to kill them in retaliation for a Hoover gang member's recent death.  (*Id.* at 314–22.)

As relevant to Petitioner's claims, Reykeisha testified that Mr. Philyaw pointed his gun at Eric and threatened to kill him after Eric came outside onto the porch and yelled at Mr. Philyaw and Petitioner.  (*Id.* at 334–37.)  Reykeisha also stated that Renisha came outside during the confrontation and that Mr. Philyaw pointed his gun at her.  (*Id.* at 322–24.)  She said that Mr. Philyaw crouched down and set his gun on the concrete, and Renisha went back inside.  (*Id.* at 325.)  Reykeisha later reiterated that Mr. Philyaw had threatened to kill Eric and Renisha when they came outside.  (*Id.* at 354.)

Reykeisha testified that when she went into the house later that evening to get her daughter, she told Eric not to go back outside because Petitioner and Mr. Philyaw were on the porch, and she told her sister-in-law to call the police.  (*Id.* at 338–40.)  Reykeisha stated that when the police came, she was standing next to her car near Mr. Philyaw and Petitioner, and her daughter was inside the car.  (*Id.* at 346–47.)  She said that the police ordered her, Mr. Philyaw, and Petitioner to put their hands up, and they did.  (*Id.* at 347.)  Reykeisha testified that Mr. Philyaw then walked around the car and threw his gun in the side yard.  (*Id.* at 347–48.)  At this time, according to Reykeisha, Petitioner was "across the street trying to throw his liquor bottle or whatever the [expletive] he was doing."  (*Id.* at 348.)

On cross examination, Mr. Thomason confronted Reykeisha with her prior testimony that when Mr. Philyaw first approached her and Stanley, Petitioner told Mr. Philyaw that they should leave before Reykeisha and Stanley called the police.  (*Id.* at 371–72.)  Reykeisha then acknowledged that this is what happened.  (*Id.* at 372.)  She also agreed that Petitioner was drinking and appeared to be intoxicated throughout the evening.  (*Id.* at 372–73.)  Mr. Thomason pointed out that Reykeisha's trial testimony that Petitioner pulled out a pocket knife contradicted her preliminary hearing testimony, in which she stated that Petitioner pulled an

object out of his pocket but did not identify a specific weapon.  (*Id.* at 373–74.)  He asked Reykeisha if Petitioner ever pointed the knife at her, and Reykeisha responded that Petitioner did not.  (*Id.* at 374.)  When Reykeisha testified that Petitioner pointed the knife at Stanley, Mr. Thomason confronted her with her contradictory prior testimony that Petitioner had not pointed the sharp object at Stanley.  (*Id.* at 374–75.)  Reykeisha agreed that Petitioner was "walking around, drinking beer" during the time that Mr. Philyaw blocked her from leaving with her daughter.  (*Id.* at 381.)  She also confirmed that Petitioner never touched her.  (*Id.* at 383.)  On re-direct examination, Reykeisha testified that Petitioner threatened to stab Stanley when Stanley tried to get something from the car.  (*Id.* at 386–88.)  On re-cross examination, Mr. Thomason asked Reykeisha if she got a "good look" at the knife, and Reykeisha admitted that she did not.  (*Id.* at 391.)

### ii.  Stanley's Testimony

Stanley testified that when Petitioner and Mr. Philyaw first confronted him, Petitioner was standing behind Mr. Philyaw and waving a knife aggressively.  (2 RT 405.)  He said that Reykeisha seemed to be familiar with Petitioner and Mr. Philyaw, and at some point, Petitioner and Mr. Philyaw put their weapons away.  (*Id.* at 406–08.)  Stanley testified that both Petitioner and Mr. Philyaw threatened to kill him, but that initially he was not "offended" by the threats because he understood that his presence as a stranger threatened them.  (*Id.* at 410–12.)  Stanley said that he began to feel threatened when the situation escalated again and got "out of control," and Petitioner and Mr. Philyaw threatened to kidnap Reykeisha.  (*Id.* at 412.)  He added that he was afraid for his own life and Reykeisha's well-being at that point.  (*Id.* at 412–13.)  Stanley testified that when he said he was leaving, Petitioner and Mr. Philyaw initially tried to stop him, but then agreed to let him leave after Reykeisha intervened.  (*Id.* at 416–18.)  Stanley said that overall, Petitioner and Mr. Philyaw threatened to kill him three or four

times.  (*Id.* at 418.)  He said that he did not call the police after leaving because he had important things to take care of at home and he felt that Reykeisha could handle the situation; he also hoped that his leaving would de-escalate the tension.  (*Id.* at 418–19.)

Stanley testified that he saw Renisha come out of the house at one point during the incident.  (2 RT at 420.)  He stated the following:

> When [Renisha] first came out, she saw the commotion of what was
> going on and she immediately like slammed the door and went back
> inside.  And then she came out again a little bit after that and she
> started talking and asked are we okay and what's going on and stuff
> like that.

(*Id.*)  Stanley stated that he never saw Eric come outside.  (*Id.* at 422.)

On cross examination, Ms. Mitchell again asked Stanley whether he ever saw Eric come outside the house, and Stanley answered that he did not.  (*Id.* at 435.)

On cross examination by Mr. Thomason, Stanley testified that he left the scene after Renisha went back inside.  (*Id.* at 442–43.)  When Mr. Thomason confronted Stanley with his preliminary hearing testimony that he left while Renisha was outside, Stanley responded that he did not remember this testimony.  (*Id.* at 443.)  Mr. Thomason introduced as a defense exhibit a photographic line-up stating that Stanley had failed to identify the individual with the knife, and questioned Stanley about this exhibit.  (*Id.* at 443–44.)  Stanley admitted that he was not able to pick Petitioner's photograph out of the lineup.  (*Id.* at 444–45.)  Stanley also confirmed that he did not see Eric or any other men come out of the house during the incident.  (*Id.* at 445.)

///

///

25

On re-direct examination, Stanley testified that he recognized Petitioner as the individual with the knife at the preliminary hearing, and he identified Petitioner at that time.  (*Id.* at 448–49.)

### iii. Officer Tello's Testimony

Next, Officer Tello testified that he and his partner, Officer Kaspian, responded to a radio call regarding an incident at the address where Renisha and Eric lived around 11:45 p.m. on June 5, 2016.  (2 RT at 450.)  When he arrived, he saw Reykeisha standing next to the driver's side of her car, with Mr. Philyaw standing right in front of her, and Petitioner standing about five feet away.  (*Id.* at 451–52.)  He commanded Petitioner and Mr. Philyaw to raise their hands, which they did.  (*Id.* at 456.)  Reykeisha did not raise her hands.  (*Id.*)  He directed Mr. Philyaw and Petitioner to walk to the middle of the street; Petitioner initially complied, but Mr. Philyaw refused.  (*Id.* at 453.)  Petitioner then became uncooperative:  he started yelling, walked to the south part of the street, and smashed a forty-ounce beer bottle under a parked car.  (*Id.* at 454.)

Officer Tello stated that he talked to Reykeisha next to her car after Petitioner and Mr. Philyaw were arrested and placed in the police vehicle.  (*Id.* at 457.)  Reykeisha was crying and shaking, and she answered Officer Tello's questions in a whisper without making eye contact.  (*Id.* at 456, 457.)   On cross examination by Mr. Thomason, Officer Tello testified that the radio call he responded to was a "415" call for "disturbing the peace" involving a group with a gun.  (*Id.* at 461–62.)  He stated that a 911 call had been made in connection with this radio call, but that neither he nor his partner interviewed the 911 caller.  (*Id.* at 462.)

Mr. Thomason confronted Officer Tello with his police report stating that Petitioner complied with the officers' commands, which contradicted his testimony that Petitioner became unruly and threw a beer bottle.  (*Id.*)  He also questioned

26

Officer Tello about whether a knife was found at the scene, and Officer Tello admitted that no knife was recovered.  (*Id.* at 462–63.)  On re-direct examination, Officer Tello testified that both Petitioner and Mr. Philyaw were very uncooperative and threatening during the booking process.  (*Id.* at 465.)

### iv. Officer Kaspian's Testimony

Officer Kaspian testified that he responded to the scene with Officer Tello and recovered a firearm.  (2 RT 467–68.)  He explained that he and Officer Tello had observed Mr. Philyaw throwing something or "making a flicking motion," and stated that he found the firearm during a search of the area where Mr. Philyaw had been standing.  (*Id.* at 468.)  There was no cross examination.  (*Id.* at 470.)

### v.  Other Witnesses

The prosecution next presented testimony regarding Petitioner and Mr. Philyaw's gang affilliation.[11]  Four police officers testified to prior encounters during which Petitioner or Mr. Philyaw identified themselves as members of the Hoovers gang (*see* 2 RT 470–86), and Officer Barragan testified as a gang expert, stating that in his opinion the instant offenses were carried out to benefit the Hoovers gang (*see id.* at 488–516).

### vi. Closing Argument

The defense did not present any witnesses.  (*See* 3 RT 601–02, 615.)  In closing, Mr. Thomason argued that Reykeisha and Stanley lacked credibility, pointing to inconsistencies in their testimony and an absence of corroborating evidence.  (*Id.* at 643–53.)  He also argued that the prosecution had failed to prove that Petitioner, who was intoxicated during the incident, had the specific intent to

---

[11] As none of Petitioner's claims relate to this testimony, the Court does not describe it in detail.

27

"help Mr. Philyaw do whatever Mr. Philyaw was doing" under an aiding and abetting theory.  (*Id.* at 652.)

### 2.  Legal Standard

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel."  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam); *see also Missouri v. Frye*, 566 U.S. 134, 138 (2012) ("The right to counsel is the right to effective assistance of counsel.").  To succeed on an ineffective assistance of counsel claim, a federal habeas petitioner must demonstrate:  (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An ineffective assistance claim may be denied if the petitioner fails to establish either prong of the *Strickland* test.  *See id.*; *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").

A petitioner may establish deficient performance by showing that "counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Id.* at 689 (citation and quotation marks omitted).  Courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Id.* at 690.  The court may neither second-guess counsel's decisions or trial strategy "nor apply the fabled twenty-twenty vision of hindsight."  *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir. 2009) (citation and quotation marks omitted); *accord Gentry*, 540 U.S. at 8 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").  Petitioner must show

28

an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

The prejudice inquiry "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000).  A petitioner may establish prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 391.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *accord Strickland*, 466 U.S. at 693 ("It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding.").

### 3. Analysis

#### a. Failure to Subpoena Eric and Renisha

In support of his first subclaim, Petitioner argues that his trial counsel should have subpoenaed Eric and Renisha because they would have "provided exculpatory evidence through their testimony, that victim Reykeisha T. and Stanley M. fabricated their story and that Eric C., called 911 for a '415 group gang call,' as outlined within the 911 transcript, recording and police records." (FAP 55.)[12]

First, Petitioner has not shown that counsel's performance fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688.  A defense

_____

[12] It is unclear how Petitioner's assertion that Eric called 911 and made a "415 group gang call" would have been helpful to Petitioner's case, (*see* Pet. 55), as Petitioner and Mr. Philyaw were members of the 107 Hoovers gang and their crimes were found to be carried out for the benefit of that gang, (*see* LD 1 at 2; 2 CT 238–42; 3 RT 910–12.)  Petitioner has not submitted the 911 call transcript or other evidence regarding the 911 call.

lawyer has a duty to conduct a reasonable investigation before trial.  *Atwood v.*
*Ryan*, 870 F.3d 1033, 1057 (9th Cir. 2017) (citing *Strickland*, 466 U.S. at 691).
However, this duty "does not necessarily require that every conceivable witness be
interviewed or that counsel must pursue every path until it bears fruit or until all
conceivable hope withers."  *United States v. Tucker*, 716 F.2d 576, 584 (9th Cir.
1983) (citation and quotation marks omitted).  In the event that defense counsel
conducts a reasonable investigation, courts will defer to counsel's strategic choices,
including the decision whether to call or subpoena a particular witness.  *See*
*Strickland*, 466 U.S. at 689–91 ("[S]trategic choices made after thorough
investigation" are "virtually unchallengeable," and "strategic choices made after
less than complete investigation" are reasonable if limited investigation is
supported by "reasonable professional judgments"); *see also Yablonsky v.*
*Montgomery*, No. EDCV14-01877-PA (DTB), 2016 U.S. Dist. LEXIS 26490, at
*69 (C.D. Cal. Jan. 14, 2016) (Rep. & Recommendation) (recommending denial of
ineffective assistance claim where "there has been no showing that counsel did not
investigate petitioner's version of the facts and strategically decide not to present
these witnesses"), *adopted*, 2016 U.S. Dist. LEXIS 26339 (C. D. Cal. Mar. 1,
2016).

Here, Petitioner has not provided any evidentiary support to indicate that his
pre-trial and trial lawyers failed to investigate Eric and Renisha as potential
witnesses, or that the decision not to subpoena Eric or Renisha was unreasonable
under the circumstances.  For example, there was no declaration provided by either
Ms. Fullinwider or Mr. Thomason stating what counsel did or did not investigate or
explaining counsels' reasoning regarding the failure to call these witnesses.
Although such a declaration by former counsel is not necessarily required,
Petitioner must do more than make conclusory allegations regarding his lawyers'
alleged errors.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory
allegations which are not supported by statement of specific facts do not warrant

habeas relief."); *see also United States v. Taylor*, 802 F.2d 1108, 1119 (9th Cir. 1986) (finding that vague and speculative assertions that counsel was ineffective did not meet the *Strickland* burden).

Second, Petitioner has not established any prejudice caused by a failure to call or subpoena Eric or Renisha as witnesses. *See Strickland*, 466 U.S. at 694. To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witness's testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *See Alcala v. Woodford*, 334 F.3d 862, 872–73 (9th Cir. 2003). Petitioner has not provided any evidentiary support, such as affidavits, indicating that either Eric or Renisha would have been willing to testify or how they would have testified. *See Dows v. Wood*, 211 F.3d 480, 486–87 (9th Cir. 2000) (rejecting ineffective assistance claim based on a failure to call witness when petitioner provided "no evidence that this witness would have provided helpful testimony for the defense – i.e., [petitioner] has not presented an affidavit from this alleged witness"); *Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *70 (rejecting ineffective assistance of counsel claim where "[p]etitioner has not presented a single affidavit from either witness verifying that they were willing to testify or what they would have testified.")

Petitioner argues that Eric and Renisha would have provided testimony that Reykeisha and Stanley "fabricated their story." (FAP 55.) However, the only evidence Petitioner can point to is the June 7, 2016 police report (which Petitioner has not submitted) allegedly containing Eric's statement that he did not want to speak to the police, and Renisha's statement that she was not present during the incident. (*See* FAP 55.) Eric's refusal to speak to the police does not necessarily imply that he would have given favorable testimony for the defense. And even if Renisha had testified that she was not home during the incident, the probative value

of such testimony would have been limited.  Although this would have contradicted

Reykeisha and Stanley's testimony that Renisha was present during portions of the

incident, it would not necessarily undermine the rest of Reykeisha and Stanley's

testimony, as Renisha would not have personal knowledge of events she did not

witness.  *See* Cal. Evid. Code § 702 (with an exception for expert witnesses that

does not apply here, "the testimony of a witness concerning a particular matter is

inadmissible unless [s]he has personal knowledge of the matter.")

     Moreover, without affidavits from Renisha or Eric, Petitioner's speculation

that Renisha or Eric would have given helpful testimony is insufficient to establish

prejudice.  In fact, given the conflicting evidence of whether Renisha and Eric were

present during the incident, these individuals may have been just as likely to give

harmful testimony against Petitioner if subpoenaed.  Thus, Petitioner fails to show

that the testimony of these potential witnesses would have created a reasonable

probability that the jury would have reached a verdict more favorable to Petitioner.

*See Strickland*, 466 U.S. at 694.

### b. Failure to Subpoena Detective Lorenz

     Next, Petitioner claims that one or both of his counsel were ineffective based

on the failure to subpoena Detective Lorenz, who unsuccessfully attempted to

interview Eric and Renisha on June 7, 2016.  (Pet. 55.)  Petitioner asserts that,

according to Detective Lorenz's report (which is not in the record before this

Court), Eric refused to speak with Detective Lorenz, and Renisha told him that "she

was not the[ere] the night of the incident," which Petitioner argues would

corroborate his "defense that the victim fabricated how the incident actually

occurred."  (Pet. 55.)

     Petitioner has not satisfied either prong of the *Strickland* inquiry.  As to

deficient performance, he does not provide a declaration from counsel or any

specific factual information to show that counsel's investigation into potential

witnesses was deficient or that the failure to subpoena Detective Lorenz was not a strategic tactical decision. *See Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *69.

As to prejudice, Petitioner has not provided an affidavit from Detective Lorenz confirming that he would have testified in conformance with his June 7, 2016 police report. *See Dows*, 211 F.3d at 486–87; *Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *70. Moreover, Detective Lorenz's testimony regarding Eric and Renisha's out-of-court statements likely would have been excluded as inadmissible hearsay: this testimony would only be helpful to Petitioner if the statements were admitted for their truth, and Petitioner has not identified any applicable hearsay exceptions. *See generally* Cal. Evid. Code § 1200 (prohibiting the introduction of "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated[,]" subject to certain exceptions). Finally, even if this testimony were permitted, evidence that Eric refused to speak to Detective Lorenz and that Renisha stated she was not present for the incident would have limited probative value and would not create a reasonable probability of a more favorable verdict for Petitioner, as discussed *supra* with regard to Petitioner's first subclaim. *See Strickland*, 466 U.S. at 694.

### c. Failure to Request Evidentiary Hearing

Next, Petitioner claims that one or both of his defense attorneys were ineffective for failing to request an evidentiary hearing after the prosecution provided notice that it intended to introduce photographs of Eric and Renisha. (FAP 55.)

"[A] defendant claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case." *Styers v. Schriro*, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008).

Petitioner has not met that standard here.  He does not explain why an evidentiary hearing was required or how such a hearing could have led to a more favorable outcome.  (*See* FAP 55.)  Presumably, this claim is related to Petitioner's due process challenge to the introduction of the photographs.  However, even assuming that these photographs of Eric and Renisha would have been excluded from evidence if Petitioner's counsel had objected or requested an evidentiary hearing, Petitioner has not shown that such exclusion would have created a reasonable probability of a more favorable outcome at trial.  *See Styers*, 547 F.3d at 1030 n.5.  As discussed *supra* at Part V.A.3.b, the photographs were introduced as background at the beginning of Reykeisha's testimony, (2 RT 313–14), and Petitioner has not shown that the admission of these photographs was improper or prejudicial.

### d. Failure to Present Evidence Regarding 911 Caller

Next, Petitioner argues that his defense attorneys "failed to introduce the 911 caller's information," which Petitioner alleges "would have clearly demonstrated the call was not pertaining to the incident that victim[s], Reykeisha, and Stanley M. testified to, and that Reykeisha was not aware as to why Officers Kaspian and Tello were dispatched."  (FAP 56.)  Petitioner appears to argue that this evidence would have helped to show that Reykeisha fabricated her story after the police arrived. (*Id.*)

Petitioner does not identify who the 911 caller was or what information was conveyed during the 911 call, let alone provide an affidavit from the 911 caller. (*Id.*)  Reykeisha testified at trial that she asked her sister-in-law (Eric's sister) to call the police when she went inside the house to get her daughter; although she assumed that her sister-in-law called the police, she did not witness the call.  (2 RT 338–40.)  Officer Tello testified that he responded to a radio call for disturbing the peace which was related to a 911 call, but that neither he nor Officer Kaspian

interviewed the 911 caller.  (*Id.* at 461–62.)  Without more information, Petitioner's assertion that the 911 caller would have provided information contradicting Reykeisha's testimony is too conclusory and speculative to warrant habeas relief. *See James*, 24 F.3d at 26; *see also Taylor*, 802 F.2d at 1119.

### e. Failure to Send an Investigator to Interview Other Witnesses at the House

Petitioner next asserts that his attorneys were ineffective because they "failed to send an investigator to obtain information from other known witnesses that were present inside the house, according to testimony and police reports."  (FAP 56.)

Under *Strickland*, "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgments."  466 U.S. at 690–91.  Counsel's duty to conduct a reasonable investigation "does not necessarily require that every conceivable witness be interviewed or that counsel must pursue every path until it bears fruit or until all conceivable hope withers." *Tucker*, 716 F.2d at 584 (citation and quotation marks omitted).

Here, Petitioner argues that counsel should have sent an investigator to interview other witnesses who were at the house, but he does not identify who these witnesses were, and does not explain what helpful information they would have, let alone submit an affidavit from any of these alleged witnesses.  (FAP 56.) Reykeisha testified at trial that Eric's adult sister and Eric's adult cousin were also at Eric and Renisha's house on the night of the incident.  (2 RT 310.)  Reykeisha stated that she told Eric's sister to call 911 when she came inside to get her daughter.  (*Id.* at 338–40.)  However, Reykeisha did not testify that Eric's sister went outside and interacted with Mr. Philyaw or Petitioner or witnessed the

incident directly.  Reykeisha did not provide any further testimony regarding Eric's adult cousin, and the record does not contain other information about him.

Given the paucity of information about these potential witnesses, Petitioner has failed to establish either that his lawyers' failure to send an investigator was unreasonable or that this failure to investigate caused him prejudice.  *See Dows*, 211 F.3d at 486–87 (rejecting ineffective assistance claim based on failure to interview alleged alibi witness based on lack of evidence that witness existed or would have provided helpful testimony); *Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *64 ("[O]ther than conclusory assertions, petitioner has not sufficiently explained how conducting a further investigation would have assisted in his defense or otherwise raised a sufficient doubt as to undermine confidence in the verdict.").

### *f. Failure to Call Expert Witness Regarding Stanley's Behavior*

Petitioner next claims that his attorneys were ineffective for failing to call an expert witness "to demonstrate to the jury that victim Stanley M.'s behavior [was inconsistent] with someone who [was] threatened to be killed . . . [because] instead of calling the police after being allowed to leave, he merely left the scene and went to work."  (FAP 56–57.)

The constitutional guarantee of effective assistance of counsel does not require consultation with experts or the introduction of expert testimony.  *See Harrington v. Richter*, 562 U.S. 86, 106–07 (2011) ("It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.  Here it would be well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts . . . ."); *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) ("[T]he presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent

defense.").  The question is whether counsel's decision not to retain an expert is reasonable, weighing the need to "balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 at 107.

Here, Petitioner contends that expert testimony would have helped to establish that Stanley's behavior—specifically, his failure to call the police—was inconsistent with the alleged assault and threats against him.  (FAP 56–57.)  Stanley testified on direct examination that he did not call the police after leaving because he had to take care of important things at home, and he felt that the situation had de-escalated at the time he left and hoped that his leaving would cause it to de-escalate further.  (2 RT 418–19.)  Neither Mr. Thomason nor Mr. Philyaw's attorney, Ms. Mitchell, cross examined Stanley about this specific issue, although Ms. Mitchell confronted Stanley with his prior testimony that he went to work after leaving the scene of the incident instead of going straight home.  (*Id.* at 435–37.)  In her closing statement, Ms. Mitchell argued forcefully that Stanley's failure to call the police—as well as the fact that he left Reykeisha with Petitioner and Mr. Philyaw and did not call her to check that she was okay—showed that he did not feel threatened and did not think that Reykeisha was in danger:

> Let's talk about Stanley.  It simply is not reasonable that Stanley would have left Reykeisha outside alone with two strange armed men late at night if this was a terrifying, threatening ordeal that the prosecution is trying to make this out to be.  Why would he do that?  That's not reasonable behavior.
>
> If it's so intense and it's so frightening and all of this is going on, why didn't Stanley call the police?  When he left, what did he do?  He said he went to work, although he changed his story and said he went home.  But he was impeached with his prior testimony that he went to work.  He never called the police.  He never called her right

1   away after he went to work to ask her "Hey, let me just make sure

2   everything's okay."  He does nothing.  It's not reasonable.

3   (3 RT 637–38.)   Mr. Thomason, who made his closing argument after Ms.

4   Mitchell, focused on inconsistencies between Stanley's trial and preliminary

5   hearing testimony and did not reiterate Ms. Mitchell's argument regarding Stanley's

6   failure to call the police.  (*Id.* at 649–50.)

7           Petitioner has not provided an expert declaration or any specific information

8   regarding the proposed expert testimony.  (FAP 56–57.)  It is unclear whether such

9   testimony would even be admissible.  The California Evidence Code requires that

10  expert opinions be "[r]elated to a subject that is sufficiently beyond common

11  experience that the opinion of an expert would assist the trier of fact."  Cal. Evid.

12  Code § 801(a).  The standard is a liberal one:  courts only exclude expert opinion

13  testimony "when it would add *nothing at all* to the jury's common fund of

14  information, i.e., when the subject of the inquiry is one of such common knowledge

15  that men of ordinary education could reach a conclusion as intelligently as the

16  witness."  *People v. Jones*, 54 Cal. 4th 1, 12 (2012) (emphasis in original) (citation

17  and quotation marks omitted).  Still, without any information from Petitioner as to

18  what the proposed expert would testify to, it is not clear that such testimony would

19  have assisted the jury in assessing Stanley's behavior, let alone bolstered

20  Petitioner's defense.  Moreover, assuming such testimony would be admissible, Mr.

21  Thomason's presentation of expert testimony likely would have prompted the

22  prosecution to present its own expert testimony on this issue.  Thus, on this record,

23  Petitioner has not established that Mr. Thomason's failure to present expert

24  testimony regarding Stanley's behavior was unreasonable.  *See Richter*, 562 U.S. at

25  106–07.  He also has not established prejudice:  Ms. Mitchell raised this issue

26  regarding Stanley's behavior in her closing argument, and Petitioner fails to explain

27  how the proposed expert's testimony would have bolstered this argument and

28

created a reasonable probability of a more favorable verdict.  *See Strickland*, 466 U.S. at 694.

### g. Failure to Object to Trial Testimony Regarding Renisha and Eric

Next, Petitioner faults his defense attorneys for failing to "suppress and object to" pre-trial and trial testimony regarding Renisha and Eric.  (FAP 57.)  He appears to argue that such testimony was improper given Renisha's and Eric's refusal to cooperate with police after the incident and Renisha's alleged statement to Detective Lorenz that she was not present during the incident.  (*Id.*)

To prevail on this claim, Petitioner must show that there was a valid legal basis for objecting to this testimony such that it would have been excluded.  In other words, the claim must fail if an objection to the testimony would have been futile.  *Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance"); *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection.").

Petitioner has not identified any valid reason why this testimony would be inadmissible under the California Evidence Code (*see* FAP 57), and no such reason is apparent from the record.  Reykeisha and Stanley testified from personal knowledge, stating their own observations regarding Renisha and Eric's interactions with Mr. Philyaw and Petitioner.  The fact that Eric and Renisha did not testify or cooperate with the police does not render Reykeisha and Stanley's testimony inadmissible.  Moreover, even if this testimony were improper and the failure to object to it was unreasonable, Petitioner would not be able to meet the prejudice prong of the *Strickland* test because he was not convicted of any crimes against Renisha or Eric, and he has not shown how this testimony affected his convictions for assaulting and threatening Reykeisha and Stanley.  *See Strickland*, 466 U.S. at 694.

1

*h. Failure to "Allow for An Opportunity to Confront" Sergeant*
*Miesner*

Petitioner next claims that his attorneys were ineffective because they "failed to allow for an opportunity to confront Sgt. Miesner, who approved the original arrest charges and the police reports done by Officers Tello and Kaspian." (FAP 57.) The Court construes this as a claim that counsel should have called Sergeant Miesner as a defense witness at trial.

Petitioner has not provided an affidavit from Sergeant Miesner, nor any information as to what helpful testimony he might have provided at trial. (*See* FAP 57.) Unlike Officers Tello and Kaspian, who testified based on their personal knowledge, Sergeant Miesner did not respond to the incident and lacked personal knowledge of the events that occurred that night. It is unclear what relevant testimony he could provide, let alone what he could say that might bolster the defense. Thus, Petitioner's conclusory allegation fails to establish either deficient performance or prejudice. *See James*, 24 F.3d at 26; *Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *69.

*i. Failure to "Allow for An Opportunity to Confront" Detective Caffey*

Similarly, Petitioner claims that his attorneys failed to "allow for an opportunity to confront Detective Caffey #23900." (FAP 58.) Petitioner asserts that "according to police reports," Detective Caffey advised Sergeant Miesner and Officers Tello and Kaspian in an "unknown role," and Petitioner speculates that Detective Caffey may have influenced the prosecutor's decision to file additional charges against Petitioner. (*Id.*) The Court construes this as a claim that counsel should have called Detective Caffey as a defense witness at trial.

Petitioner has not provided an affidavit from Detective Caffey, nor any information as to what helpful testimony he might have provided at trial. (*See id.*) Even assuming, as Petitioner speculates, that Detective Caffey advised that

1   additional charges be filed against Petitioner, his testimony likely would be

2   inadmissible because he lacked personal knowledge of the events at issue.  Further,

3   even if admissible, his testimony regarding the decision to file additional charges

4   would not necessarily be helpful to the defense.  Thus, Petitioner's conclusory

5   allegation fails to establish either deficient performance or prejudice.  *See James*,

6   24 F.3d at 26; *Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *69.

7

8   *j. Failure to Identify and Subpoena Additional Police Officers*

9   Next, Petitioner claims that his attorneys failed to identify and subpoena

10  "additional officers that arrived moments after the initial officers, Kaspian and

11  Tello," asserting that, "additional information and discovery stems from their

12  observations and presence that wasn't made available for Petitioner's examination."

13  (FAP 58.)  Petitioner cites the preliminary hearing transcript.  (*Id.*)  It appears that

14  he is referring to the following exchange which occurred during Reykeisha's cross

15  examination by Petitioner's attorney, Ms. Fullinwider:

16      **Ms. Fullinwider:**  When the police arrived, do you remember

17      how many cars – how many different police cars arrived, do you

18      remember?

19      **Reykeisha:**  I couldn't see.

20      **Ms. Fullinwider:**  Okay.  Do you remember, more than one?

21      **Reykeisha:**   Yeah, more than one.

22      **Ms. Fullinwider:**  And did they arrive at the same time or

23      different times, if you know?

24      **Reykeisha:**   Can you rephrase that?

25      **Ms. Fullinwider:**  Sure.  The police cars when they arrived,

26      you saw them when they arrived, right?

27      **Reykeisha:**  Yes.

28      **Ms. Fullinwider:**  You said it was more than one, maybe two

41

that arrived?

   **Reykeisha:** Yes.

   **Ms. Fullinwider:** Did they arrive at the same time

simultaneously?

   **Reykeisha:** Yes. Yes.

(1 CT 83–84.)

  However, Reykeisha did not testify to how many different police *officers* responded did the scene.  (*See id.*)  Officer Tello also testified at the preliminary hearing that "another unit" arrived at the scene after he and Officer Kaspian arrived, but he could not remember how long after.  (*Id.* at 135–36.)  Petitioner does not point to any other evidence that additional officers responded to the scene and were present during Petitioner and Mr. Philyaw's arrest.  (*See* FAP 58.)

  In any event, Petitioner does not now provide affidavits from these police officers—or at the very least, identify the officers and describe what information they could have provided that would have been helpful to the defense.  (*See id.*)  For these reasons, his claim is too conclusory to establish that his attorneys' failure to identify and subpoena additional officers was unreasonable or resulted in prejudice.  *See James*, 24 F.3d at 26; *Yablonsky*, 2016 U.S. Dist. LEXIS 26490, at *69.


    *k. Failure to Submit Petitioner's Medical Records to Trial Court*

  Petitioner next claims that he received ineffective assistance of counsel because his attorneys failed to submit his mental health records to the trial court.  (FAP 58.)  Specifically, he argues as follows:

   On or about August 11, 2016, the def. atty's [sic] were made aware of

   Petitioner[']s long and extensive mental health history that stems back

   to 1996 when the State of California official diagnosis [sic] is severe

   depression with psychotic [tendencies].  Petitioner has been receiving

> 100% S.S.I. disability payments since that time.  Moreover, at no time did the def. atty. follow through as part of his ethical duties to submit[] the requested medical records to the trial court.

(*Id.*)  Petitioner attached his mental health records as "Exhibit C."  (FAP 60–80.)  An August 2012 psychiatric record from Antelope Valley Mental Health Clinic states that Petitioner reported hearing voices, feeling paranoid, getting about four hours of sleep per night, and having a depressed mood at the time of the interview.  (*Id.* at 62.)  This report states that Petitioner had made three past suicide attempts, one of which occurred in 1997 (the dates of the other suicide attempts are not stated).  (*Id.*)  Petitioner was prescribed an anti-psychotic medication, Risperdal.  (*Id.* at 68, 77.)  In November 2012, Petitioner reported that the medication was helping, his sleep had improved, and he felt more "mellow," but he still experienced paranoia.  (*Id.* at 79.)  A progress note dated December 2012 states that Petitioner had the following functional impairment:  "[a]uditory hallucinations and paranoia interfere with interpersonal relations and ability to work."  (*Id.* at 76.)  However, the record does not discuss treatment, but rather records a call regarding Petitioner's IHSS[13] paperwork, states that Petitioner did not have a current plan to harm himself or others, and states that Petitioner's progress will continue to be monitored.  (*Id.*)  Petitioner's Risperdal prescription was increased in January 2013 after he reported continued paranoia.  (*Id.* at 78.)  Petitioner stated at that time that he did not have a current plan to harm himself or others.  (*Id.*)  In July 2013, Petitioner was discharged from treatment because he had not made any contact since January 2013.  (*Id.* at 73.)  A printout showed that Petitioner had received mental health treatment on ten occasions dating back to 1994, with the most recent

---

[13] IHSS appears to refer to the In-Home Supportive Services Program, which is administered by the State of California and provides services to individuals who are over sixty-five years of age, disabled, or blind.  *See* In-Home Supportive Services (IHSS) Program, Cal. Dep't of Soc. Servs., https://www.cdss.ca.gov/in-home-supportive-services (last visited Nov. 6, 2020).

1   treatment ending in July 2013.  (*Id.* at 80.)  Petitioner did not provide any more

2   recent mental health records.  (*See id.* at 60–80.)

3          Petitioner attached duplicate copies of these mental health records to his

4   Traverse.  (Traverse 34–75.)  The Traverse also includes documents showing how

5   these records were obtained by counsel and sent to Petitioner.  Petitioner submitted

6   a memorandum by his pre-trial attorney, Ms. Fullinwider, addressed to "New

7   Attorney," which states in relevant part, "D's sister says D has MH issues.  I've

8   sent out records requests to Augustus Hawkins, Compton MH, Lynnwood MH, and

9   Antelope Valley MH.  Not sure how/if these will help but they should be coming."

10  (*Id.* at 77.)  On August 11, 2016, a Deputy Alternate Public Defender named

11  Patricia Dill sent a letter to Antelope Valley Mental Health Clinic requesting all of

12  Petitioner's records from "January 1, 2006 to the present."  (*Id.* at 36.)  Petitioner's

13  trial attorney, Mr. Thomason, sent copies of these mental health records to

14  Petitioner in December 2016.  (*Id.* at 33.)

15         Petitioner also submitted a medical order from the Los Angeles County

16  Superior Court dated June 8, 2020 ordering the Los Angeles County Sheriff and

17  Los Angeles County Jail Medical Services to provide a psychiatric examination and

18  treatment (as well as medical and dental examinations and treatment) upon

19  defendant's request.  (Traverse 78.)  The order states that the court did not wish to

20  be informed of the results of such examinations.  (*Id.*)  Petitioner has not submitted

21  any other records regarding mental health treatment during his incarceration.

22         "Trial counsel has a duty to investigate a defendant's mental state if there is

23  evidence to suggest that the defendant is impaired."  *Douglas v. Woodford*, 316

24  F.3d 1079, 1085 (9th Cir. 2003).  However, after conducting a reasonable

25  investigation, trial counsel's tactical decision of whether to present mental health or

26  other mitigating evidence is afforded deference.  *See generally Strickland*, 466 U.S.

27  at 689–91; *see also, e.g.*, *Atwood v. Ryan*, 870 F.3d 1033, 1063 (9th Cir. 2017)

28  ("We have held that counsel's decision not to pursue a mental health defense is a

44

reasonable strategic decision under *Strickland* where it avoided the introduction of dueling mental health experts, evidence of the petitioner's past acts . . . as rebuttal evidence, and details of the crime." (citations and quotation marks omitted)).

Here, Petitioner did not submit a declaration from Ms. Fullinwider or Mr. Thomason explaining the full scope of their investigation into Petitioner's mental health or the reasons this evidence was not presented to the trial court. (*See generally* FAP; Traverse.) Petitioner has not shown that his attorneys' investigation into his mental health was inadequate because he has not submitted any mental health records that the attorneys failed to obtain, nor has he provided specific factual information regarding any mental health-related evidence that the attorneys failed to obtain. The most recent records Petitioner has submitted date back to 2012 and 2013 and were obtained by his attorneys in advance of trial. Given that these records were over three years old at the time of the incident and show that Petitioner's paranoia and other symptoms were improving with medication, it would have been reasonable for Petitioner's attorneys not to present a mental health defense based on these records alone.

Even assuming that Petitioner's attorneys failed to conduct an adequate investigation into Petitioner's mental health or that their failure to present the records they obtained was unreasonable, Petitioner must establish prejudice by showing a reasonable probability that the introduction of these mental health records would have affected the outcome of Petitioner's criminal case. *See Douglas*, 316 F.3d at 1087 (holding that although petitioner's counsel's mental health investigation was inadequate, petitioner did not meet his burden to establish prejudice (citing *Strickland*, 466 U.S. at 694)). Petitioner has failed to meet that burden. These records alone are insufficient to demonstrate that Petitioner's mental illness affected his criminal intent at the time of the 2016 incident or had become so severe that he was incompetent to stand trial in 2016. Petitioner also has not

shown that submission of these records would have led to a shorter sentence.[14]
Thus, Petitioner has not shown that his attorneys' failure to present these mental
health records to the trial court resulted in prejudice.

### l. Failure to Object to Prosecutor's Opening Statement

Petitioner next claims that his trial attorney was ineffective for failing to
object the prosecutor's opening statement, which "misled the jury into believing
that the prosecution had a knife" as part of the evidence against Petitioner because
"after she [the prosecutor] . . . explained to the jury how Petitioner had brandished
the knife and threatened and assaulted the victims with the knife, she asked the jury
to come back with a verdict of guilty against Petitioner." (FAP 81.)

During her opening statement, Assistant District Attorney Cynthia
Valenzuela stated that Petitioner "pulled out a knife," and later referred to Petitioner
as the defendant "with the knife." (2 RT 304, 306.)  She also acknowledged that
the police officers did not find the knife. (*Id.* at 306.)

As stated *supra*, "trial counsel cannot have been ineffective for failing to
raise a meritless objection." *Juan H.*, 408 F.3d at 1273.  Petitioner has not shown
that an objection to the prosecutor's opening statement would have succeeded
because the prosecutor's argument was supported by Stanley and Reykeisha's
testimony that Petitioner pulled out a pocket knife and threatened them with it. (*See*
2 RT 318, 330, 338, 349–50, 373–74, 385–87, 405–06, 448–49.)  Although Officer
Tello testified that the knife was never recovered (*id.* at 135), the prosecutor
acknowledged this fact during her opening statement (*id.* at 306).  In any event,

---

[14] The trial court did not explicitly consider Petitioner's mental health at sentencing,
but granted a defense motion to strike a sentencing enhancement for Petitioner's
prior convictions, citing Petitioner's age (forty five years old), the fact that he had a
"support role" or "very minor role" during the instant offenses, and the judge's
assessment that Petitioner was "slowing down" his criminal activity.  (3 RT 1204–
05, 1218.)

Petitioner cannot establish prejudice because the jury found not to be true the special allegations that Petitioner personally used a knife in committing the offenses of conviction.  (2 CT 238–42; 3 RT 910–12.)  *See Strickland*, 466 U.S. at 694.

### m. Challenge to Jury's Verdict

In his FAP, Petitioner asserts that "the jury neglected to observe the elements and instructions" on aiding and abetting, without further elaboration.  (FAP 81.)   In the Traverse, Petitioner argues that his trial lawyer was ineffective for failing to object when the jury did not follow the aiding and abetting instructions.  (Traverse 12–15.)  Instead of challenging the court's jury instruction on aiding and abetting or pointing to specific evidence that the jury disregarded this instruction, Petitioner appears to argue that the evidence was insufficient to find him guilty of the charges of assault and criminal threats against Reykeisha and Stanley because he did not directly assault or threaten either victim or aid and abet Mr. Philyaw in doing so.[15] (*See id.*)

Petitioner has not provided any evidence or specific factual assertions to show that his attorney provided ineffective assistance on this issue.  (Traverse 12–15.)  Mr. Thomason moved for a judgment of acquittal based on insufficient evidence pursuant to California Penal Code section 1118.1, which the trial court granted as to Count Ten charge of sexual battery and denied as to all other counts.  (*Id.* at 608–09.)  He also argued in his closing statement that Petitioner did not aid and abet Mr. Philyaw's crimes.  (3 RT 652.)  Petitioner's conclusory assertion fails to establish either deficient performance or prejudice.  *See James*, 24 F.3d at 26.

As discussed above, Petitioner fails to meet this burden as to each of his subclaims.  Thus, he is not entitled to habeas relief on Ground Two.

---

[15] To the extent Petitioner intends to raise a freestanding challenge to the sufficiency of the evidence, he has waived this claim by raising it for the first time in his Traverse.  *See Delgadillo*, 527 F.3d at 930 n.4.

1

2

**C.     Habeas relief is not warranted for Petitioner's *Napue* and *Brady***

         **claims in Ground Three.**

3

4

5

6

7

8

9

In Ground Three, Petitioner claims that his due process rights were violated when Officer Tello falsely testified that Petitioner became uncooperative during his arrest.[16] (FAP 6, 85–86; Traverse 16.)  Petitioner also claims that the prosecution withheld evidence consisting of the names and reports or notes of other police officers who responded to the scene (FAP 85–86), which the Court liberally construes as a claim that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963).

10

11

12

13

Respondent argues that Petitioner fails to state a due process claim based on the presentation of false testimony or evidence.  (Answer 30–32.)  However, Respondent does not specifically address Petitioner's *Brady* subclaim.  (*See id.*)

14

15

1. Background

a. *Napue* Subclaim

16

17

On direct examination, the prosecutor asked Officer Tello about Petitioner's behavior during his arrest.  (2 RT 453–55.)  Officer Tello testified as follows:

18

19

20

21

22

23

24

> At first Mr. Morgan, he did walk to the middle of the street as I
> directed him.  When Mr. Philyaw started backing up towards the back
> of the Buick, Mr. Morgan started yelling.  He was—he became
> uncooperative.  He was holding a beer bottle, a 40 ounce beer bottle.
> He walked towards the south part of the street, he got the beer bottle,
> he threw it under a car, smashed the bottle under a vehicle that was
> there.  Kind of circling, upset, angry.

25

(*Id.* at 454.)

26

27

28

---

[16] Petitioner also appears to reiterate his claim made in Ground One regarding the allegedly falsified police reports.  (FAP 85–86.)  This claim is addressed *supra* at Part V.A.3.a.

1    On cross examination, Officer Tello admitted that this description was not

2    included in his arrest report, which simply stated that Petitioner complied.  (*Id.* at

3    462.)

4

5           *b.  Brady Subclaim*

6    Reykeisha testified at the preliminary hearing that two police cars arrived

7    simultaneously in response to the 911 call.  (1 CT 83–84.)  However, she did not

8    testify to how many different police officers were present.  (*See id.*)

9    Officer Tello testified at the preliminary hearing that "another unit" arrived at

10   the scene after he and Officer Kaspian arrived, but he could not remember how long

11   after.  (*Id.* at 135–36.)

12

13        2.  Legal Standard

14          *a.  Napue Subclaim*

15   The Court applies the legal standard set forth *supra* in Part V.A.2.

16

17          *b.  Brady Subclaim*

18   "Under *Brady*, prosecutors are responsible for disclosing 'evidence that is

19   both favorable to the accused and material either to guilt or to punishment.'"

20   *Browning v. Baker*, 875 F.3d 444, 459 (9th Cir. 2017) (quoting *United States v.*

21   *Bagley*, 473 U.S. 667, 674 (1985)).  Failing to turn over such evidence violates due

22   process.  *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam) (citing *Brady*

23   at 87).  The prosecutor has an obligation to turn over evidence favorable to the

24   defense regardless of whether the defense requests it.  *See Kyles v. Whitley*, 514

25   U.S. 419, 433 (1995).

26   "To establish a *Brady* violation, [a petitioner] must show: '(1) the evidence at

27   issue is favorable to the accused, either because it is exculpatory or because it is

28   impeaching; (2) the evidence was suppressed by the government, regardless of

whether the suppression was willful or inadvertent; and (3) the evidence is material to the guilt or innocence of the defendant.'" *Sanders v. Cullen*, 873 F.3d 778, 802 (9th Cir. 2017) (quoting *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013)).

To prevail on a *Brady* claim, a petitioner need not show that he "more likely than not" would have received a different verdict if the evidence were admitted; instead, he "must show only that the new evidence is sufficient to undermine confidence in the verdict." *Wearry*, 136 S. Ct. at 1006 (citation and quotation marks omitted). Suppressed evidence must be considered "collectively, not item by item." *Kyles*, 514 U.S. at 436.

Petitioner's failure to show the existence of the evidence upon which his claim is based alone is sufficient to deny his *Brady* claim. *See Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012) ("[T]o state a *Brady* claim, [a habeas petitioner] is required to do more than 'merely speculate' about [possible evidence]."); *see also, e.g.*, *Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (rejecting *Brady* claim where petitioner provided only "mere suppositions" that a report existed and contained exculpatory evidence); *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting *Brady* claim as "speculative").

### 3. Analysis

#### a. Napue Subclaim

Petitioner's claim relies entirely on the discrepancy between Officer Tello's direct examination testimony that Petitioner became uncooperative and threw a beer bottle, and his admission on cross examination that the arrest report stated that Petitioner complied.[17] (FAP 6, 85–86; Traverse 16.) This inconsistency does not establish that Officer Tello's testimony was false, or that the prosecution knew it

---

[17] This arrest report excerpt that Petitioner attached to his Traverse does not include this statement. (Traverse 82.)

was false.  *See Hayes*, 632 F.3d at 520–21.  Further, this testimony does not directly relate to the charges against Petitioner, and the jury was able to weigh the credibility of Officer Tello's description of Petitioner's uncooperative behavior against the arrest report's statement that Petitioner complied.  Thus, even assuming that Officer Tello testified falsely that Petitioner became uncooperative, Petitioner has not shown that this testimony was material, or "reasonably likely to have affected the judgment of the jury."  *Phillips*, 267 F.3d at 985.

### b.  Brady Subclaim

Petitioner argues that according to Reykeisha and Officer Tello's preliminary hearing testimony, "additional unknown officers arrived at the scene," and that the prosecution withheld these officers' "names, reports, notes, or other vital observation information" which should have been made available for Petitioner to "confront, examine, or subpoena for all proceedings."  (FAP 85–86.)  Petitioner's claim fails because he merely speculates as to the existence of this evidence and does not explain how the information from other police officers who responded to the scene would be exculpatory, impeaching, or material to his guilt or innocence.  *See Runningeagle*, 686 F.3d at 769; *Phillips*, 267 F.3d at 987; *Downs*, 232 F.3d at 1037.

As discussed above, Petitioner's *Napue* and *Brady* subclaims fail on the merits.  Thus, Petitioner is not entitled to habeas relief on Ground Three.

## VI.  Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing but does not provide any factual or legal argument to support this request.  (FAP 93; Traverse 3.)

To earn the right to an evidentiary hearing, a petitioner is "required to allege specific facts which, if true, would entitle him to relief."  *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (quoting *United States v. Mullen*, 98 F.3d 1155, 1159 (9th

Cir. 1996)).  Petitioner fails to support his request for an evidentiary hearing with any reference to specific evidence.  *See, e.g., Eden v. Ryan*, No. CV-15-8020-PCT-DGC (JFM), 2016 U.S. Dist. LEXIS 32413, at *97 (D. Ariz. Jan. 12, 2016) ("Where a petitioner does not proffer any evidence to be adduced at an evidentiary hearing which would prove the allegations of the petition, the habeas court need not grant a hearing."); *Garcia v. Clark*, No. CIV S-10-0968 GEB DAD P, 2012 U.S. Dist. LEXIS 134240, at *180 (E.D. Cal. Sept. 18, 2012) ("[P]etitioner has not identified any concrete and material factual conflict in need of resolution that would require this court to hold an evidentiary hearing.").

Accordingly, Petitioner's request for an evidentiary hearing is denied.

## VII. Request for Appointment of Counsel

Petitioner also requests that counsel be appointed but does not provide any factual or legal argument to support this request.  (FAP 93; Traverse 3.)

There is no right to counsel in federal habeas proceedings.  *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, . . . and we decline to so hold today.").  Nevertheless, a court may appoint an attorney to represent a financially eligible habeas petitioner when "the interests of justice so require."  18 U.S.C. § 3006A(a)(2)(B); *see also* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel.").

Appointment of counsel is required only in certain situations:  when counsel is "necessary for effective discovery," pursuant to Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"); when "an evidentiary hearing is warranted," pursuant to Rule 8(c) of the Habeas Rules; and when the circumstances of a case indicate that an appointment is necessary to prevent due process violations.  *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir.

1986); *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983); *see also Knaubert v. Goldsmith*, 791 F.2d 722, 728–29 (9th Cir. 1986) (outlining due process analysis in habeas appointment inquiry).  Petitioner has not shown that he is entitled to discovery or an evidentiary hearing, or that his right to due process would be violated absent an appointment.  *See Chaney*, 801 F.2d at 1196; *Weygandt*, 718 F.2d at 954.  Accordingly, this Court is not compelled to appoint counsel at this time.

Nor is the Court persuaded that exercise of its discretion to appoint counsel is appropriate.  "In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved."  *Weygandt*, 718 F.2d at 954.  Petitioner has not shown an inability to articulate his claims *pro se* in light of the complexity of the legal issues involved.  *See, e.g.*, *La Mere v. Risley*, 827 F.2d 622, 626 (9th Cir. 1987) (affirming denial of request for appointment of counsel where pleadings illustrated that habeas petitioner "had a good understanding of the issues and the ability to present forcefully and coherently his contentions").  For the reasons stated *supra* in the Court's analysis of Petitioner's claims, Petitioner also has not shown that he is likely to succeed on the merits.

Accordingly, the Court denies Petitioner's request for appointment of counsel.

///
///
///
///
///
///
///

1   **VIII.  CONCLUSION**

2          IT THEREFORE IS ORDERED that the Petition is denied and that judgment

3   shall be entered dismissing this action with prejudice.

4

5   DATED:  November 18, 2020

6

7   _____

8   MARIA A. AUDERO
    UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28